Bradley S. Slighting (10225)
SLIGHTING LAW
1707 Village Center Circle, Suite 100
Las Vegas, NV 89134
Tel: (702) 847-5061
brad@slightinglaw.com

Chris Wellman (*Pro Hac Vice Pending*)
WELLMAN & WARREN LLP
24411 Ridge Route, Suite 200
Laguna Hills, CA 92653
Tel: (949) 580-3737
cwellman@w-wlaw.com

Attorneys for Plaintiff,
Epic Trading International, LLC

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Epic Trading International, LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>Saleh Carver Enterprises, LLC, a Michigan limited liability company; Thomas Carver an individual and Ali Saleh an individual;<br><br>Defendants. | Case No. 2:21-cv-512<br><br>**COMPLAINT**<br><br>1. **BREACH OF WRITTEN CONTRACT (SECTION 4.8.4 OF THE POLICIES & PROCEDURES)**<br>2. **BREACH OF WRITTEN CONTRACT (SECTION 4.8.3 OF THE POLICIES & PROCEDURES)**<br>3. **VIOLATION OF THE DEFENSE OF TRADE SECRET ACT**<br>4. **TORTIOUS INTERFERENCE WITH CONTRACT**<br>5. **DEFAMATION**<br>6. **TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>7. **VIOLATION OF THE UNIFORM TRADE SECRET ACT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Epic Trading International, LLC ("Epic"), a Nevada limited liability company, alleges as follows:

## PARTIES

1. Plaintiff Epic is a Nevada limited liability company with its principal place of business located at 10120 S. Eastern Ave., Henderson, NV 89052.

2. Defendant Saleh Carver Enterprises, LLC ("SCE") is a Michigan limited liability company with its principal place of business located at 120 N. Cole Street, Perrington, Michigan 48871.

3. Defendant Thomas Carver ("Carver") is an individual residing at 120 N. Cole Street, Perrington, Michigan 48871.

4. Defendant Ali Saleh ("Saleh") is an individual residing at 121 Burnham Road, Morris Plains, New Jersey 07950. Saleh and Carver are the members of SCE.

## JURISDICTION

5. This Court has subject matter jurisdiction under the Federal Defense of Trade Secret Act (18 U.S.C. §1832) pursuant to federal question jurisdiction under 28 U.S.C. §1331.

6. This Court also has subject matter jurisdiction under 28 U.S.C. §1332, as there is complete diversity in this action and the amount in controversy exceeds $75,000. Specifically, Epic, and all its members, are domiciled in a state that is different from the states of each of the named Defendants.

## STATEMENT OF FACTS

**Epic Trading International**

7. Epic is in the business of selling educational programs to assist consumers in becoming successful in trading on the Foreign Exchange – otherwise known as "forex" – market. Epic uses a structured multi-level marketing ("MLM") model to distribute and sell its programs.

8. MLM companies, such as Epic, market and distribute their products or services through independent distributors. Other well-known MLM companies are Amway and HerbaLife.

9. In Epic's business, the independent distributors are called "Independent Business Owners" or "IBOs." The IBOs are remunerated pursuant to a "Compensation Plan," which provides a series of rankings, commissions, and bonuses based upon their sales volume and the sales of IBOs placed beneath them. In other words, an IBO can earn commission on his/her own sales of products as well as the sale of products of those IBOs aligned in multiple levels beneath him/her – hence, the term "multi-level marketing." The line of people aligned below a particular IBO is known as the IBO's "downline" or "downline organization." An MLM company may refer to its downline of distributors as its "genealogy."

**Enrollment Process**

10. To become an IBO for Epic, an individual must submit an "IBO Application." The IBO Application is completed electronically and submitted to Epic via its website. By submitting the application, IBOs agree to abide by Epic's "Policies & Procedures," which govern the manner in which an IBO may operate his/her Epic business.

11. Upon receipt of the application, Epic enters the IBO's personal information into the company's database, creates a distributor account, and assigns the IBO an identification number. Once completing that process, the IBO is then permitted to participate in Epic's Compensation Plan.

12. The IBO Application, Compensation Plan, and the Policies & Procedures collectively comprise Epic's "IBO Agreement."

///

///

///

**The Database**

13. The base of distributors is the lifeblood of any MLM company, and it is no different with Epic. Development of the distributor base takes a significant amount of time and investment of hundreds of thousands, if not millions of dollars.

14. Epic maintains a database of its IBOs. The database consists of the list of IBOs, their rank, their contact information, their payments history, their order history, their pricing history, their consumer customer contact information, their bonus history, as well as other information. The database is a prime asset of Epic and is kept on Epic's computerized servers with restricted access. Access to this database can only be achieved through use of a password. In other words, the list of IBOs (which includes their contact information) is akin to a customer list and is maintained in confidence.

15. Epic goes to extensive lengths to maintain the secrecy of its database. Not only is access to the database strictly controlled, but all IBOs must agree to Epic's Policies & Procedures, which specifically state that the database of IBOs constitutes a proprietary asset of Epic.

16. In addition, each IBO, prior to becoming a distributor, expressly agrees to maintain the confidentiality of Epic's proprietary information and to abide by the following written policy:

> **4.8.4 Downline Activity (Genealogy) Reports**
> Downline Activity Reports made available for Scholar/IBO access and viewing at Epic's official website, are considered confidential. Scholar/IBO access to their Downline Activity Reports is password protected. All Downline Activity Reports and the information contained therein are confidential and constitute proprietary information and business trade secrets belonging to Epic. Downline Activity reports are provided to Scholar/IBO in the strictest of confidence and are made available to Scholar/IBO for the sole purpose of assisting Scholar/IBO in working with their respective Downline Organizations in the development of their Epic business. Scholar/IBO should use their Downline Activity reports to assist, motivate and train their Downline Scholar/IBO. The Scholar/IBO and Epic agree that, but for this agreement of confidentiality and nondisclosure, Epic would not provide Downline Activity Reports to the Scholar/IBO. A Scholar/IBO shall not, on his or her own behalf, or on behalf of any other person, partnership, association, corporation or other entity:

- Directly or indirectly disclose an information contained in any Downline Activity Report to any third party;
- Directly or indirectly disclose the password or other access code to his or her Downline Activity Report;
- Use the information to compete with Epic or for any purpose other than promoting his or her Epic business;
- Recruit or solicit any Scholar/IBO or Customer of Epic listed on any report or in any manner attempt to influence or induce any Scholar/IBO or customer of Epic to alter their business relationship with Epic;
- Use of disclose to any person, partnership, association, corporation or other entity any information contained in any Downline Activity report.
- Upon demand by the Company, any current or former Scholar/IBO will return the original and all copies of the Downline Activity Reports to the Company.

During the term of the Epic Brand Agreement and for a period of five (5) years after your termination or the Agreement's expiration, you shall not:

- Use the information in the Downline Activity Reports to compete with Epic or for any purpose other than promoting his or her Epic business;
- Use or disclose to any person or entity any confidential information contained in the Downline Activity Reports, including the replication of the genealogy in another network marketing company.

17. Also, as stated in the policy above, all IBOs expressly agree not to use Epic's proprietary information to compete either directly or indirectly with the company.

18. Epic expends a great deal of its money, time, and effort to build and promote its distributor base. To further protect this distributor base, Epic requires that each of its IBOs agree to a non-solicitation provision, which states:

**4.8.3 Non-solicitation**
During the term of this Agreement, Scholar/IBO may not recruit other Epic Scholar/IBOs or Merchant or customers for any other network marketing or referral-based business. This applies to ALL members regardless of their placement in any organization in Epic. Following the cancellation of this Agreement, and for a period of one year thereafter, a former Scholar/IBO may not recruit any Epic Scholar/IBO or customer for another network marketing business, with the exception of a Scholar/IBO who is personally sponsored by the former Scholar/IBO. The Scholar/IBO and Epic recognize that because network marketing is conducted through networks of independent contractors dispersed across the entire United States and internationally, and business is commonly conducted via the Internet and telephone, an effort to narrowly limit the geographic scope of this non-solicitation provision would render it wholly ineffective. Therefore, the Scholar/IBO and Epic agree that this non-solicitation provision shall apply to all markets in which Epic conducts business.

The term "recruit" means actual or attempted solicitation., enrollment, encouragement or effort to influence in any other way, either directly or through a third party, another Epic

> Scholar/IBO or customer to enroll or participate in another multilevel marketing, network marketing, direct sales opportunity or referral based business. This conduct constitutes recruiting even if the Scholar/IBO's actions are in response to an inquiry made by another Scholar/IBO or customer.

**The Defendants**

19. Defendant SCE was a former IBO and agreed to the terms set forth in the IBO Agreement. As an IBO, Defendant was provided access to electronic software known as a "back-office," wherein it could see portions of Epic's database to monitor it distributorship business and manage those IBOs that were recruited to and placed within its downline.

20. As mentioned above, access to the back-office software system was password protected and was intended only to be used for purposes of promoting Epic's business.

21. Also, the back-office afforded each IBO the opportunity to view the list of other IBOs in their respective downlines, including their rank, their contact information, their payments history, their order history, their pricing history, their customer contact information, their bonus history, as well as other information.

22. SCE enrolled as an IBO on August 30, 2020. Defendants Carver and Saleh were the sole members of SCE and were, at all relevant times mentioned herein, acting on behalf of SCE.

23. SCE accepted the terms of the IBO Agreement.

24. By accepting the mentioned terms, SCE understood that all the data contained in its back-office was proprietary to Epic. SCE was also informed, verbally, on many occasions by Epic that information contained within the back-office must only be used for promoting its Epic business.

25. During the course of its relationship with Epic, SCE utilized the information stored in its back-office to build its Epic business. Specifically, Carver and Saleh, on behalf of SCE, took information from SCE's back-offices and inputted the same it into their private Telegram messaging centers.

26. Telegram is a multi-platform messaging service that allows multiple devices, such as the iPhone and Android, to communicate with each other. With the Telegram App, users can message other Telegram users, create group conversations, call contacts, and send files and stickers.

27. When building SCE's business, Carver and Saleh extracted IBO contact information from SCE's back-office and stored that data in their Telegram messaging centers. By doing this, Carver and Saleh either simultaneously, or individually, communicated with SCE's downline, which assisted in the growth of its Epic business.

28. As stated above, the information Carver and Saleh took from SCE's back-office was proprietary, belonged to Epic, and could not be used for any purpose other than growing SCE's Epic business. Defendants acknowledged this by accepting the terms of the IBO Agreement.

29. Eventually, SCE were terminated from Epic for violating the terms of Epic's IBO Agreement on February 26, 2021

30. After being terminated, Defendants became affiliated with a different MLM company named BE. Similar to Epic, BE also sells educational programs relating to the Forex market.

31. After enrolling with BE, Defendants began raiding their former downline at Epic by using the proprietary information they took from SCE's back office. For instance, Defendants used their Telegram account to send mass solicitation messages to SCE's former downline. In these messages, Defendants solicited IBOs to join BE by convincing them they would make more money. On information and belief, Defendants were able to make these representations because they gained access to IBO commission history through the back-office. Both the contact information and the commission history of all the IBOs was proprietary to Epic and was being improperly used by Defendants to unfairly compete. Had it not been for Epic granting Defendants

access to the back-office, which included both contact information and commission history of IBOs, Defendants would never been able to contact the IBOs and entice them to join BE.

32. To make matters worse, Defendants began inducing IBOs to terminate their relationship with Epic by defaming the company. For example, Defendants carried out a campaign of defamation against Epic by telling IBOs that: 1) Epic was poorly managed; 2) that Epic was not paying commissions because it failed to monitor its payment processing; and 3) that Epic had no intention of expanding internationally despite what it represented to its IBOs. As a direct result of these defamatory statements, several IBOs terminated their relationship with Epic and joined BE.

33. Because of Defendants' misappropriation of Epic's trade secrets and interference, many IBOs have terminated their relationship with the company. Unless Defendants are enjoined from their conduct, more IBOs will continue to resign, and Epic will suffer irreparable harm. Therefore, Epic files suit to both seek a permanent injunction and damages against Defendants.

## CLAIM 1

## BREACH OF WRITTEN CONTRACT (SECTION 4.8.4 OF THE POLICIES & PROCEDURES)

**(By Epic against SCE)**

34. Epic incorporates all preceding paragraphs as though fully set forth here.

35. SCE and Epic entered into a written contract called the IBO Agreement.

36. The IBO Agreement incorporates Epic's Policies & Procedures.

37. According to Section 4.8.4 of the Policies & Procedures, it states:

> **4.8.4 Downline Activity (Genealogy) Reports**
> Downline Activity Reports made available for Scholar/IBO access and viewing at Epic's official website, are considered confidential. Scholar/IBO access to their Downline Activity Reports is password protected. All Downline Activity Reports and the information contained therein are confidential and constitute proprietary information and business trade secrets belonging to Epic. Downline Activity reports are provided to Scholar/IBO in the strictest of confidence and are made available to Scholar/IBO for the sole purpose of assisting Scholar/IBO in working with their

respective Downline Organizations in the development of their Epic business. Scholar/IBO should use their Downline Activity reports to assist, motivate and train their Downline Scholar/IBO. The Scholar/IBO and Epic agree that, but for this agreement of confidentiality and nondisclosure, Epic would not provide Downline Activity Reports to the Scholar/IBO. A Scholar/IBO shall not, on his or her own behalf, or on behalf of any other person, partnership, association, corporation or other entity:

- Directly or indirectly disclose an information contained in any Downline Activity Report to any third party;
- Directly or indirectly disclose the password or other access code to his or her Downline Activity Report;
- Use the information to compete with Epic or for any purpose other than promoting his or her Epic business;
- Recruit or solicit any Scholar/IBO or Customer of Epic listed on any report or in any manner attempt to influence or induce any Scholar/IBO or customer of Epic to alter their busines relationship with Epic;
- Use of disclose to any person, partnership, association, corporation or other entity any information contained in any Downline Activity report.
- Upon demand by the Company, any current or former Scholar/IBO will return the original and all copies of the Downline Activity Reports to the Company.

During the term of the Epic Brand Agreement and for a period of five (5) years after your termination or the Agreement's expiration, you shall not:

- Use the information in the Downline Activity Reports to compete with Epic or for any purpose other than promoting his or her Epic business;
- Use or disclose to any person or entity any confidential information contained in the Downline Activity Reports, including the replication of the genealogy in another network marketing company.

38. Epic has performed all obligations required of it under the terms of the IBO Agreement.

39. SCE breached Section 4.8.4 of the Policies & Procedures by using Downline Activity Reports to unfairly compete against Epic. Specifically, within five (5) years of being terminated from Epic, SCE utilized the reports to solicit Epic's IBOs and convince them to end their relationship with Epic and/or join BE.

40. SCE was not excused from complying with their obligations under Section 4.8.4 of the Policies & Procedures.

41. As a result of SCE's breach, Epic has been damaged in an amount that continues to escalate and is to be proven at trial.

# CLAIM 2

## BREACH OF WITTEN CONTRACT (SECTIONS 4.8.3 OF THE POLICIES & PROCEDURES)

### (By Epic against SCE)

42. Epic incorporates all preceding paragraphs as though fully set forth here.

43. SCE and Epic entered into a written contract called the IBO Agreement.

44. The IBO Agreement incorporated Epic's Policies & Procedures.

45. Sections 4.8.3 of the Policies & Procedures state as follows:

**4.8.3 Non-solicitation**
During the term of this Agreement, Scholar/IBO may not recruit other Epic Scholar/IBOs or Merchant or customers for any other network marketing or referral-based business. This applies to ALL members regardless of their placement in any organization in Epic. Following the cancellation of this Agreement, and for a period of one year thereafter, a former Scholar/IBO may not recruit any Epic Scholar/IBO or customer for another network marketing business, with the exception of a Scholar/IBO who is personally sponsored by the former Scholar/IBO. The Scholar/IBO and Epic recognize that because network marketing is conducted through networks of independent contractors dispersed across the entire United States and internationally, and business is commonly conducted via the Internet and telephone, an effort to narrowly limit the geographic scope of this non-solicitation provision would render it wholly ineffective. Therefore, the Scholar/IBO and Epic agree that this non-solicitation provision shall apply to all markets in which Epic conducts business.

The term "recruit" means actual or attempted solicitation., enrollment, encouragement or effort to influence in any other way, either directly or through a third party, another Epic Scholar/IBO or customer to enroll or participate in another multilevel marketing, network marketing, direct sales opportunity or referral based business. This conduct constitutes recruiting even if the Scholar/IBO's actions are in response to an inquiry made by another Scholar/IBO or customer.

46. Epic has performed all obligations required of it under the terms of the IBO Agreement.

47. SCE breached Section 4.8.3 of the Policies & Procedures by recruiting IBOs into another multi-level marketing company within one (1) year of its termination from Epic. None of the IBOs recruited were personally sponsored by SCE.

48. SCE was not excused from their obligations under the terms set forth in Section 4.8.3 of the Policies & Procedures.

49. As a result of SCE's breach, Epic has been damaged in an amount that continues to escalate and is to be proven at trial.

## CLAIM 3

## VIOLATION OF THE DEFENSE OF TRADE SECRET ACT

### (By Epic against all Defendants)

50. Epic incorporates all preceding paragraphs as though fully set forth here.

51. Epic owns a database containing valuable information including the identities and contact information of all its IBOs and customers. This computer database has substantial economic value. MLM companies refer to this database as their "genealogy."

52. An MLM company's genealogy is its lifeblood because it would have no way to sell its products or services to customers without its sales force of independent distributors.

53. Other MLM Companies are constantly competing with Epic for the services of these independent distributors and for its customers. Accordingly, Epic takes great precaution to guard the identities of these people.

54. Such precautions include having each IBO agree that the information is confidential and proprietary to the company. Moreover, the information is contained on password protected software.

55. Defendants improperly used and disclosed Epic's database to solicit IBOs to quit Epic and join BE.

56. Defendants knew, or had reason to know, they acquired Epic's trade secrets by improper means.

57. Epic's genealogy database was a trade secret at the time it was misappropriated by Defendants.

58. Defendants used Epic's trade secrets without its express or implied consent to unfairly compete against Epic.

59. Defendants were unjustly enriched as a result of using Epic's database.

60. Defendants' use and disclosure of Epic's genealogy was a substantial factor in causing their unjust enrichment.

61. As a direct and proximate result of Defendants' use of Epic's database, Epic has suffered damages in an amount that continues to escalate and is to be proven at trial.

## CLAIM 4

## TORTIOUS INTERFERENCE WITH CONTRACT

### (By Epic against all Defendants)

62. Epic incorporates all preceding paragraphs as though fully set forth here.

63. Epic has valid, written contracts with each of its IBOs. The contract is called the IBO Agreement.

64. Defendants have knowledge of these contracts, given that they, themselves, were former IBOs.

65. Defendants intentionally interfered with these contracts and committed acts that were designed to disrupt the contractual relationships between Epic and its IBOs. This was done by contacting IBOs and defaming Epic. Specifically, Defendants would inform IBOs that: 1) Epic was poorly managed; 2) that Epic was not paying commissions to its IBOs due to its failure to monitor its payment processing; and 3) that Epic had no intention of expanding internationally despite what it represented to its IBOs.

66. As a result of Defendants' defamation, IBOs have terminated their relationships with Epic, thus, causing economic loss to the company.

67. Defendants' harmful conduct has caused Epic to suffer damages in an amount to be proven at trial.

68. Defendants' actions were premeditated and were done with oppression, malice, and a complete disregard for the rights of Epic. Therefore, in addition to Epic's other damages, the Defendants are liable for punitive and exemplary damages.

## CLAIM 5

## DEFAMATION

### (By Epic against all Defendants)

69. Epic incorporates all preceding paragraphs as though fully set forth here.

70. Defendants have publicized false and defamatory statements of fact to IBOs regarding Epic. Specifically, Defendants have informed IBOs that: 1) Epic was poorly managed; 2) that Epic was not paying commissions due to its failure to monitor its payment processing; and 3) that Epic had no intention of expanding internationally despite what it represented to its IBOs.

71. The mentioned statements were not privileged.

72. Defendants either knew or should have known that the statements were false.

73. As a result of Defendants' false statements, IBOs have resigned from Epic, thereby causing economic harm to Epic.

74. Defendants' actions were premeditated and were done with oppression, malice, and a complete disregard for the rights of Epic. Therefore, in addition to Epic's other damages, the Defendants are liable for punitive and exemplary damages.

## CLAIM 6

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

**(By Epic against all Defendants)**

75. Epic incorporates all preceding paragraphs as though fully set forth here.

76. Epic had a relationship with its IBOs that contained a probable future economic benefit to Epic. In other words, if Epic's IBOs continue to sell Epic's products, then Epic's revenue increases exponentially.

77. Defendants knew of these relationships, given that they, themselves, were IBOs.

78. Defendants committed independently tortious acts to interfere with these relations. Specifically, Defendants defamed Epic to convince IBOs to leave Epic and join BE.

79. As a result of Defendants' conduct, IBOs have resigned from Epic to join BE. The departure of these Associates has caused economic harm to Epic in an amount that continues to escalate and is to be proven at trial.

80. Defendants' actions were premeditated and were done with oppression, malice, and a complete disregard for the rights of Epic. Therefore, in addition to Epic's other damages, the Defendants are liable for punitive and exemplary damages.

## CLAIM 7

## VIOLATION OF THE UNIFORM TRADE SECRET ACT

**(By Epic against all Defendants)**

81. Epic incorporates all preceding paragraphs as though fully set froth here.

82. As stated above, Epic had a trade secret, which included proprietary information contained within its database.

83. Defendants were afforded access to Epic's database solely for the purpose of promoting their distributorship.

84. Defendants breached this confidential relationship by using the database to solicit and recruit IBOs into a competing MLM company named BE.

85. As a result of Defendants' actions, Epic has been damaged in an amount that continues to escalate and is to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Epic requests judgment against Defendants, and each of them, as follows:

1. For compensatory damages in an amount to be proven at trial;
2. For punitive damages;
3. For temporary and permanent injunctive relief;
4. For an award of attorney's fees;
5. For costs of suit herein incurred; and
6. For such other and further relief as the court may deem just and proper.

DATED: March 29, 2021			**SLIGHTING LAW**

					By:	*/s/ Bradley S. Slighting*
						Bradley S. Slighting, Esq.
						Plaintiff,
						EPIC TRADING INTERNATIONAL, LLC

DATED: March 29, 2021			**WELLMAN & WARREN**

					By:	*/s/ Chris Wellman*
						Chris Wellman, Esq.
						Plaintiff,
						EPIC TRADING INTERNATIONAL, LLC

-15-
**COMPLAINT**